**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| GORDON TANTUM, INC., | : | Civil Action No. 06-1490 (JJH) |
|  | : |  |
| Plaintiff, | : |  |
|  | : |  |
| v. | : |  |
|  | : |  |
| CHEF SOLUTIONS, INC., | : | **M E M O R A N D U M** |
|  | : | **O P I N I O N** |
| Defendant. | : |  |
|  | : |  |

**HUGHES, U.S.M.J.**

This matter comes before the Court upon Defendant Chef Solutions, Inc.'s ("Defendant's")

Motion for Partial Summary Judgment.  (Docket Entry No. 22.)  Plaintiff's memorandum of law in

support of Plaintiff's opposition was filed on June 11, 2008.  (Docket Entry No. 26.)  On June 13,

2008, Defendant filed its reply to Plaintiff's Opposition.  (Docket Entry No. 28.)

For the reasons set forth below, Defendant's Motion is granted with respect to calculation

of Plaintiff's damages in the event Plaintiff succeeds in establishing Defendant's liability and denied

in all other respects.

## I.      BACKGROUND AND PROCEDURAL HISTORY

This matter was initiated on March 30, 2006, when Plaintiff, a New Jersey corporation, filed

its complaint ("Complaint") against Defendant, a corporation chartered under Delaware law.

(Docket Entry No. 1, ¶¶ 2-3.)  The Complaint alleged that the nature of Plaintiff's business was that

of a "broker[] and distributor[,]" and that "[t]he bulk of [P]laintiff's business [consisted of] locating

and arranging for shipment and delivery of potatoes to wholesale manufacturers of potato salads and

[other] potato products." Id. ¶¶ 6-7. Plaintiff, apparently, perceived Defendant as one of those manufacturers, since "one aspect of [Defendant's] business include[d] the manufacturing and selling of potato salads and mashed potatoes on a wholesale basis." Id. ¶ 8; see also Docket Entry No. 5 ("Answer"), ¶ 8. According to Plaintiff, "the parties' business relationship commenced in 1992-1993[,] when Defendant was [doing business under another corporate name]. During the course of the relationship[,] Plaintiff's business with Defendant increased to the point that 90% of Plaintiff's business was with Defendant[,] . . . and 95% of that business was supplying potatoes." (Opp'n. at 3.)

As the relationship continued, "[o]n October 21, 2002, [P]laintiff entered into a written contract [with Defendant] for the sale of a [certain] quantity of potatoes" ("K-I"). Compl. ¶ 9; see also Ans. ¶ 9. Two other contracts of similar nature were executed between Plaintiff and Defendant on November 7, 2002 ("K-II"), and on December 3, 2002 ("K-III"). According to these contracts, Plaintiff was to act as a seller who agreed, at its own expense, to plant and grow (or to acquire) a certain type of potato and deliver a certain quantity of it to Defendant. See Compl. at 10-21. While the contracts did not detail how Plaintiff was to go about growing the potatoes contractually due to Defendant, "[i]t was no secret from Defendant that Plaintiff was not itself growing the . . . potatoes needed to fulfill the contracts": Plaintiff was a "middleman" acquiring the needed potatoes from certain suppliers (who were actual potato farmers). (Opp'n. at 5; accord Reply at 9, n. 6.)

On April 8, 2003, Defendant terminated all three contracts and notified Plaintiff of that development. (Mem., Ex. 2.) According to Defendant, the contracts were legitimately terminated because Plaintiff's "shipments of potatoes to [Defendant] contain[ed] [']foreign hazardous material,['] such as glass, metal and excess rock," and Plaintiff "refuse[d] to provide [Defendant]

with commercially reasonable assurances" that it would be able to produce potatoes of the standard expected by Defendant.  Id.  Plaintiff's position, however, is that Defendant's termination of the contracts was not legitimate, since Defendant "refus[ed] to accept delivery of potatoes delivered in conformity with the [K-I] and [also] refused all future deliveries of potatoes" under the K-II and K-III.  (Compl. ¶ 12; see also Opp'n. at 4 (asserting that, during the business relationship preceding Plaintiff's performance of K-I, Plaintiff: (a) "had very few shipments of potatoes rejected by Defendant[; (b)] was unaware of there ever being any significant quality control issues[; and (c) developed an opinion that,] given that one is dealing with potatoes, the presence of some rocks or foreign debris being found in a truckload shipment is not unexpected")).

About three years after being notified that the K-I, K-II and K-III were terminated by Defendant, Plaintiff filed the instant Complaint.  The Complaint sets forth three causes of action, each paraphrased in terms of breach of contract.  (Compl. ¶¶ 6-32.)  Each cause of action expressly corresponded to an individual contract, i.e., "Count I" was dedicated to an alleged breach of K-I, executed on October 21, 2002; "Count II" was devoted to the alleged breach of the K-II, entered in on November 7, 2002, while "Count III" consisted of a discussion of the alleged breach of the K-III, executed on December 3, 2002.  See id.  K-I stated that Plaintiff had to grow or acquire "at least 74,700 cwt."[1]  Id. at 10.  The K-II and K-III contained identical language, with the former creating Plaintiff's obligation to grow or acquire "at least 199,000 ctw," and the latter binding Plaintiff to grow or acquire "at least 25,000 cwt."  See id. at 14, 18.

---

[1]

The abbreviation "cwt" stands for the term "hundredweight" (also called, in the United States, a "cental"), a unit of mass measurement.  In the United States, one cental equals 100 pounds (or 45.359237 kg); the measurement is different in the United Kingdom.  For the purposes of this Opinion, the Court will use the term "cental."

On September 29, 2006, Defendant filed its Answer (Docket Entry No. 5), and -- following a number of scheduling orders -- the Court affirmed the parties' stipulated discovery timetable (which directed conclusion of fact discovery by March 7, 2008, and expert discovery by May 23, 2008).  (Docket Entry No. 19.)  With that, the parties engaged in discovery proceedings and, apparently, by the closure of these proceedings, Defendant learned that:

> [a]lthough[] Plaintiff[ had] testified . . . that [its] estimated lost profit totaled less than $240,000, Plaintiff . . . now [sought] to recover in excess of $4 million in damages: (i) for alleged breach of a total of *six contracts*, three of which are not identified anywhere in the Complaint . . . ; (ii) on behalf of [Plaintiff's suppliers] that have no legal relationship with [Defendant]; and (iii) for "anticipated future lost profit," . . . based on Plaintiff's . . . assumption that its business relationship with Defendant would have continued for some undefined period in the future [had Defendant not terminated K-I, K-II and K-III].

Mem. at 1 (emphasis in original).

Apparently surprised by the aforesaid claims, Defendant filed the instant Motion seeking "summary judgment dismissing Plaintiff's unfounded and speculative damages claims and limiting them to the proper measurement of damages," to be calculated pursuant to the Uniform Commercial Code ("UCC").[2]  See id. at 2.  Plaintiff's Opposition largely confirmed Defendant's understanding of Plaintiff's damages calculations.  (Opp'n., Table of Contents (verifying the correctness of Defendant's perception)).  On June 17, 2008, the parties consented to the Court's jurisdiction, pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  (Docket Entry No. 29.)

## II.   DISCUSSION

---

[2]

It appears that both parties concede that the three contracts fall within the scope of the UCC, since the UCC governs transactions involving merchants and the sale of goods.  The Model UCC, Article 2, was largely adopted by New Jersey and became Article 2 of NJ's UCC, codified at N.J. Stat. Ann. 12A:1-101, et seq.

4

### A.   Standard of Review

Summary judgment is appropriate under Fed. R. Civ. P. 56(c) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Carrasca v. Pomeroy, 313 F.3d 828, 832-33 (3d Cir. 2002).  A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The Court shall "view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor."  Andreoli v. Gates, 482 F.3d 641, 647 (3d Cir. 2007) (citation omitted).  "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence . . . ."  Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (quoting Anderson, 477 U.S. at 255).

When the moving party has the burden of proof on an issue at trial, that party has "the burden of supporting their motions 'with credible evidence . . . that would entitle [them] to a directed verdict if not controverted at trial.'"  In re Bressman, 327 F.3d 229, 237 (3d Cir. 2003) (quoting Celotex, 477 U.S. at 331); see also United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1438 (11th Cir. 1991) ("When the moving party has the burden of proof at trial, that party must show affirmatively the absence of a genuine issue of material fact: it . . . must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party")  (emphasis removed, internal citations omitted).  Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists.  See Jersey Cent. Power & Light Co. v. Lacey Twp., 772 F.2d 1103, 1109 (3d

Cir. 1985). The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial. See Anderson, 477 U.S. at 248; Siegel Transfer, Inc. v. Carrier Express, Inc., 54 F.3d 1125, 1130-31 (3d Cir. 1995). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." Schoch v. First Fid. Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990); see also Fed. R. Civ. P. 56(e) (requiring nonmoving party to "set forth specific facts showing that there is a genuine issue for trial"). Conversely, "[i]f the motion does not establish the absence of a genuine factual issue, the district court should deny summary judgment even if no opposing evidentiary matter is presented." Foster v. Morris, 208 F. App'x 174, 179 (3d Cir. 2006).

### B.   The Scope of the Litigation

#### 1.   The Parties' Factual Allegations

Plaintiff alleges that Defendant should have been aware "of what contracts and schedules are at issue." (Opp'n at 29.) Clarifying what Defendant should have been aware of, Plaintiff states that, since: (a) the Complaint exhibits (replicating K-I, K-II and K-III) were attached to the Complaint; and (b) Plaintiff perceived K-I, K-II and K-III as merely "boilerplate forms, . . . the significant and important details of [which could not have been ascertained without] the various schedules which were not" made part of these exhibits, the sole fact that plaintiff asserted Causes I, II and III (based, respectively, on K-I, K-II and K-III) put Defendant on notice of Plaintiff's intention to litigate--for the purposes of establishing the amount of potatoes Defendant was obligated to buy under these contracts--all delivery/payment "schedules" that Plaintiff could perceive as related to K-I, K-II and K-III. See id. at 29-30.

While, apparently, agreeing with Plaintiff's position that *some* delivery/payment schedules could be deemed implicated by the pleadings contained in the Complaint, Defendant, nonetheless, maintains that:

(a)    since "[e]ach of these three contracts do[es] identify the purchase and sale of a specific quantum of potatoes, expressly on the face of each contract, respectively: (1) 74,700 cwt [in K-I]; (2) 199,000 cwt [in K-II]; and (3) 25,000 [in K-III]" (Reply at 11), and--since these figures correspond exactly to the figures stated in three specific delivery/payment schedules ("Defendant's Set of Schedules")--*only these three* specific delivery/payment schedules could be deemed implicated by the pleadings contained in the Complaint, see id. (relying on three schedules replicated in Docket Entry No. 22-2, Exs. B, C, and D); and

(b)    all other delivery/payment "schedules produced during discovery [cannot be deemed] part of the three contracts" challenged in -- and attached to -- the Complaint. See id. at 12.

Plaintiff, however, disagrees with Defendant's limiting opinion as to which delivery/payment schedules could be deemed implicated by the Complaint. Plaintiff asserts that, since the Complaint's attachment consisted only of copies of K-I, K-II and K-III but no particular delivery/payment schedules, *any* such schedule that Plaintiff could deem as relevant to the three contracts was automatically implicated by the pleadings contained in the Complaint. (Opp'n. at 30.) Counting all such allegedly relevant delivery/payment schedules, Plaintiff arrives at a total of six ("Plaintiff's Set of Schedules"), three of which comprise a set identical to Defendant's Set of Schedules, while the other three provide additional data ("Additional Set of Schedules"). See id.

Consequently, Defendant's Set of Schedules consists of the following three documents:

1.   The schedule providing for delivery of and payments for 74,700 centals of potatoes, which is a computer-generated grid of ten columns and twenty-four rows ("Schedule I").  (Docket Entry No. 22-2, Ex. B.)  The grid has the heading reading "Gordon Tantum, Inc. 2002-2003 Delphos Salad Potato Volume," and it provides for monthly deliveries of various quantity of potatoes during the time period running from October 2002 to September 2003 (with exception of double delivery during June 2003), as well as for payments for these deliveries under the "[n]et 30 days" terms, without any rebate.  See id.  This grid is neither dated nor signed.  See id.  Defendant, apparently, corresponds Schedule I to K-I, and accompanies Schedule I with an equally unsigned and undated document having the heading reading "Specifications" ("Specs-I").  See id.

2.   Next, there is the schedule providing for delivery of and payments for 199,000 centals of potato, which is also a computer-generated grid, but of twelve columns and twenty-seven rows ("Schedule II").  (Docket Entry No. 22-2, Ex. C.)  A writing under the grid indicates that Schedule II is a November 11, 2002, amendment of another, unspecified, schedule; Schedule II is signed, but solely by a Defendant's officer.  See id.  The grid has the heading reading "Gordon Tantum, Inc. 2003-2004 Delphos Mash Potato Volume," and it provides for monthly deliveries of various quantity of potatoes from August 2003 to May 2004, as well as for payments for these deliveries under the "[n]et 30 days" terms, with a certain rebate.  See id. Defendant, apparently, corresponds that Schedule II to K-II, and accompanies it with an unsigned and undated document having the heading reading "Specifications" ("Specs-II"), although the content of the Specs-II differs from that of the Specs-I accompanying Schedule I.  See id.

8

3.      Finally, there is the schedule providing for delivery of and payments for 25,000 centals of

potato, which, too, is a computer-generated grid, although of nine columns and seventeen

rows ("Schedule III").   (Docket Entry No. 22-2, Ex. D.)   The grid has the heading reading

"Gordon Tantum, Inc. 2002-2003 Delphos Mash Potato Volume," and it provides for a single

delivery in April-May of 2003 and for a payment for this delivery under the "[n]et 30 days"

terms, with a certain rebate.  See id.  This Schedule III is neither dated nor signed.  See id.

Defendant, apparently, corresponds this Schedule III to K-III.  See id.  No document titled

"Specifications" accompanies Schedule III.  See id.

As noted supra, Plaintiff's Set of Schedules incorporates the above-described Defendant's Set

of Schedules and, in addition, provides the following two schedules comprising, apparently, two-

thirds of the Additional Set of Schedules:

1.      The first schedule provides for delivery of and payments for 135,000 centals of potato; this

schedule is, similarly, a computer-generated grid, but of nine columns and twenty-four rows

("Schedule IV").   (Docket Entry No. 25-2, at 16.)   The grid has a heading reading "Gordon

Tantum, Inc. 2002-2003 Delphos Mash Potato Volume" (i.e., the same heading as the one

utilized in Schedule III), and it provides for monthly deliveries of various quantity of potato

from October 2002 to May 2003 (hence, for deliveries overlapping with those due under

Schedule III), as well as for payments for these deliveries under the "[n]et 30 days" terms,

with a rebate, although the rebate is different from that provided in Schedule III.   See id.

Same as Schedules I and III, this grid is not signed and, same as Schedule II, it indicates that

it is a November 11, 2002, amendment of another, unspecified, pre-existing schedule.[3]  See id.  Plaintiff does not clarify which of the three contracts this grid should be deemed corresponding to.[4]  See id.  No document titled "Specifications" accompanies Schedule IV. See id.

2.    The second schedule provides for delivery of and payments for 236,250 centals of potato, and it is also a computer-generated grid, this time, of thirteen columns and twenty-four rows ("Schedule V").  (Docket Entry No. 25-2, at 15.)  The grid has a heading reading "Gordon Tantum, Inc. Wheeling Potato Contract June[20]01 - August [20]04," and it provides for monthly deliveries of various quantity of potatoes from the month of June (of unspecified year) to the month of June (of the following but equally unspecified) year, as well as for payments for these deliveries under the "[n]et 30 days" terms, without any rebates.  See id. Schedule V is signed by Petitioner and dated, oddly enough, as of October 21, 2002, without any handwriting (or an alternative marking) indicating that Schedule V is a "revised" version of a certain pre-existing schedule.  See id.  No document titled "Specifications" accompanies Schedule V.  See id.

---

[3]

Although the data provided in Schedule IV overlaps with that provided in Schedule III (allegedly correlating to K-III), it appears that Schedule IV cannot be an amended version of the schedule incorporated by reference into K-III, since K-III was executed on December 3, 2002, while Schedule IV indicates that it is a "revision" of a certain pre-existing schedule, and that "revision" was executed three weeks *prior* to the execution of K-III (hence, suggestion that the pre-revised schedule, as well as the agreement underlying it, was executed long before K-III came in existence). (Docket Entry No. 22-2, Ex.D; Docket Entry 25-2, at 16.)

[4]

According to Defendant, Plaintiff's deposition indicates that Schedule IV was part of another agreement, under which both parties fully performed in accordance with Schedule IV.  (Mem. at 12-13 (citing Docket Entry No. 22-2, Ex. H)).

### 2.    The Parties' Legal Positions

Both parties frame the issue of this motion in terms of Rule 8's pleading requirement. Specifically, Plaintiff asserts that, pursuant to the "notice pleading" requirement, Plaintiff's Complaint duly notified Defendant of Plaintiff's intent to file a legal action on the basis of the Plaintiff's Set of Schedules (which includes both Defendant's Set of Schedules and the Additional Set of Schedules).  (Opp'n. at 30-34.)   Relying on an unofficial procedural manual, Plaintiff maintains that an "acceptable pleading in the [f]ederal [c]ourts is one of simplicity."  Id. at 28-29 (citing Weissenberger's Federal Civil Rules of Procedure 2008 Litigation Manual). Plaintiff argues that, since a Defendant's officer acknowledged, during the post-pleading-stage depositions, that this officer was aware of the existence of all six schedules comprising Plaintiff's Set of Schedules, Defendant should be deemed notified of Plaintiff's intent to file a legal action on the basis of Plaintiff's Set of Schedules.  See id. at 30-34.

   Defendant disagrees, maintaining that the Complaint provided it solely with a notice as to Plaintiff's intent to litigate alleged breaches of K-I, K-II and K-III, the documents which Defendant reads as "identify[ing] the purchase and sale of a specific quantity of potatoes, expressly on the face of each contract, respectively: (1) 74,700 cwt of potatoes [in K-I]; (2) 199,000 cwt of potatoes [in K-II]; and (3) 25,000 cwt of potatoes [in K-III].  Consequently, [Defendant maintains that] there [was] no fair notice of any claim for . . . breach of any other [Defendant's obligations to buy] any other amount of potatoes," even if Plaintiff reads the statements made in  Plaintiff's Set of Schedules as suggesting such obligations.  (Reply at 11-12.)   Therefore, Defendant construes Plaintiff's reference to the Plaintiff's Set of Schedules as a de facto attempt to amend Plaintiff's Complaint in

circumvention of the requirements posed by Rule 15, which language Defendant reads as preventing Plaintiff from a de jure amendment of the Complaint at this late stage of litigation. See id. at 12-13.

In determining the sufficiency of a Complaint, the Court must be mindful to construe the facts stated in the complaint liberally in favor of the plaintiff.  See Haines v. Kerner, 404 U.S. 519 (1972); United States v. Day, 969 F.2d 39, 42 (3d Cir. 1992).  Thus, the Court should "accept as true all of the [factual] allegations in the complaint and reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff."  Morse v. Lower Merion School Dist., 132 F.3d 902, 906 (3d Cir. 1997).  However, while a court will accept well-pled allegations as true, it will not accept bald assertions, unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations.  See id.

Relying on guidance provided by the United States Supreme Court, the Third Circuit provided District Courts with detailed instructions as to what kind of allegations qualify as pleadings sufficient to pass muster under Rule 8.  See Phillips v. County of Allegheny, 515 F.3d 224, 230-34 (3d Cir. 2008). The Court of Appeals explained:

> Rule 8 "requires a 'showing,' rather than a blanket assertion, of entitlement to relief." [Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 165 n.3 (2007).  The Supreme] Court further explained that a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." Id. at 1965 & n.3.

Phillips, 515 F.3d at 230-34 (original brackets removed).

Here, it appears undisputed that the Complaint provided fair notice of the alleged breaches of K-I, K-II and K-III.  (See Compl.)  Moreover, the fact that Plaintiff entered sub-headings correlating Plaintiff's Counts I, II and III to the respective contracts, as well as attached copies of these three contracts to its Complaint, undoubtedly clarified the notice.  (Docket Entry No. 1.)

12

Therefore, Defendant was provided with fair notice, within the meaning of Rule 8, of Plaintiff's intent to litigate the three *contracts*.  However, the Complaint, with all its sub-headings and attachments, was silent as to Plaintiff's intent to litigate these contracts either in light of Defendant's Set of Schedules <u>*or*</u> Plaintiff's Set of Schedules (consisting of both Defendant's Set of Schedules and the Additional Set of Schedules).  Consequently, pursuant to the guidance provided in <u>Twombly</u> and <u>Phillips</u>, the Court finds that there was no notice as to Plaintiff's intent to litigate <u>*any*</u> set of schedules (be it Plaintiff's set or Defendant's set) was given in the Complaint.  <u>See Phillips</u>, 515 F.3d at 234 (directing district court to reject <u>Conley</u>'s "no set of facts" pleading standard "because [it] requir[es] judges to speculate about undisclosed facts").

It follows that the "scope-of-the-litigation" issue presented by the parties cannot be resolved through the Rule 8 inquiry. Rather, the issue at hand could be resolved only through an inquiry as to the *scope of the three contracts*.  The Court, consequently, re-frames this issue accordingly, <u>i.e.</u>, as a question of whether the language employed in K-I, K-II and K-III automatically implicated Plaintiff's Set of Schedules, or Defendant's, or  none of the above.

### 3.   The Scope of the Contracts

#### a.   *Pertinent Contractual Provisions*

At this juncture, the Court repeats the pertinent language in the three contracts at hand.  K-I includes the following clauses:

> Now, therefore, in consideration of the mutual covenants hereinafter set forth[, Plaintiff and Defendant] agree as follows:

> 1.      [Plaintiff] agrees[,] at its own expense, during the growing season of 2002-2003, to plant and grow or acquire at least 74,700 cwt of the variety of potato (or varieties of potatoes} that is specified by [Defendant. ("Seller Clause")].

> 2. Subject to the terms and conditions of this Agreement, [Defendant] agrees to purchase the quantities of [Plaintiff's] potatoes described in Schedule ["]A["] at the price set forth in schedule "A"[("Buyer Clause")].
>
> 5. [Plaintiff's] potatoes delivered to [Defendant] shall be in accordance with the specifications set forth in the Appendix[] attached hereto (the "Specifications") [("Specification Clause")].

Compl., Ex. A.

The difference between K-II and K-I is limited to the fact that the Seller Clause provided for Plaintiff's obligation to grow or acquire 199,000 centals (and do so during the growing season of 2003 only), while K-III differs from K-I solely by the fact of Plaintiff was to grow or acquire 25,000 centals.  See id. Exs. B, C.   In all other substantive respects, all three contracts are identical.

### b. *Pertinent Key Requirements Posed by Article 2 of the UCC*

Article 2 of the UCC creates a flexible, policy-sensitive framework intended to be responsive to developing commercial practices.  See N.J. Stat. Ann. § 12A:2-101, Official Comm. ("The purpose [of the Code] is to avoid making practical issues between practical [merchants] turn upon . . . an intangible something").  The Statute of Frauds ("SOF"), on the other hand, represents a rigid, policy-free, mechanical threshold test for enforceability and mandatorily requires a written agreement.  The New Jersey SOF provides, inter alia, that,

> a contract for the sale of goods for the price of $ 500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought . . . . [Moreover, an enforceable] writing is . . . not enforceable . . . beyond the quantity of goods shown in such writing. [However, a] contract which does not satisfy the [aforesaid writing] requirement, . . . but which is valid in other respects[,] is enforceable . . . if the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract for sale was made, [although such admitted] contract is not enforceable . . . beyond the quantity of goods admitted [("Admission Exception")].

N.J. Stat. Ann. § 12A:2-201(1), (3)(b).

Thus, quantity is the sole material term left unaffected (short of the Admission Exception) by the liberal policies of the UCC.  If the quantity of goods is not stated in the contract, "the agreement is not reasonably certain as to [the contract's] material terms[, and] there is a fatal indefiniteness with the result that the agreement is void."   John D. Calamari, Joseph M. Perillo, Contracts § 2-9 (3rd ed. 1987) (emphasis removed).  Since the quantity of goods is a simple term, it is usually stated, as a precise quantity, in the very body of the writing constituting the agreement, especially if the agreement is characterized by parties who are close geographically and buy or sell goods in short-term discrete transactions, which are uncluttered by such concerns as marketing arrangements, the need to obtain long-term financing, creative tax deductions, employee training programs and potential changes in regulatory dictates.

The world of modern commerce, however, also knows "open-quantity" contracts intended to accommodate situations where the producer's output or the purchaser's needs are unclear, and the parties seek maximum flexibility.  Such agreements contain quantity terms measured either by the output of the seller ("output contracts") or the requirements of the buyer ("requirements contracts").[5]

A requirement contract typically contains either: (1) no specific quantity of goods, or (2) a figure expressly designated as an estimate of the quantity anticipated, or (3) a range, i.e., a minimum amount that the seller must provide, coupled with a maximum that the buyer can ask for.  See, e.g.,

---

[5]

The New Jersey statute, accommodating these concepts, provides that "[a] term[,] which measures the quantity by the output of the seller or the requirements of the buyer[,] means such actual output or requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or[--]in the absence of a stated estimate[--]to any normal or otherwise comparable prior output or requirements may be tendered or demanded."  N.J. Stat. Ann. § 12A:2-306.

Utah Int'l, Inc. v. Colorado-Ute Electric Assoc., 425 F. Supp. 1093 (D. Colo. 1976); but see Doral Hosiery Corp. v. Sav-A-Stop, Inc., 377 F. Supp. 387 (E.D. Pa. 1974) (no usage of trade or course of dealing allowed to show quantity under a clearly established agreement). A typical output contract obligates a buyer to buy a fixed fraction of all that a particular producer can produce; an utmost variation of such contracts is an "exclusive dealing" agreement, which is intended to protect the seller who, in an *exclusive arrangement* with the buyer, depends entirely upon the buyer to make the market for all goods the seller can produce in good faith. See Tigg Corp. v. Dow Corning Corp., 962 F.2d 1119, 1125 and n.4 (3d Cir. 1992).

### c.   *Contractual Quantity Terms Cannot Be Summarily Established*

Defendant maintains that "[e]ach of these three contracts do[es] *identify the purchase and sale of a specific quantity of potatoes, expressly on the face of each contract*, respectively: (1) 74,700 cwt [in K-I]; (2) 199,000 cwt [in K-II]; and (3) 25,000 [in K-III]." (Reply at 11 (emphasis supplied)). However, contrary to Defendant's contentions, neither K-I, nor K-II nor K-III identifies, on its face, either a *sale* or a *purchase* of a specific quantity of potatoes. Rather, each contract contains its respective Seller Clause, pursuant to which Plaintiff is obligated, during a certain season, to plant and grow, or to acquire (rather than to sell,) at least a set minimum amount of potatoes. (Compl., Exs. A, B, C.) Moreover, no statement made in the corresponding Buyer Clauses of these contracts indicates that Defendant undertook an obligation to purchase either that set minimum amount of Plaintiff's potatoes, or a quantity above or below that amount. See id. All that the Buyer Clause of each contract provides for is Defendant's obligation to purchase the quantities of Plaintiff's potatoes described in a certain "Schedule A." See id. If such "Schedule A" provided for Defendant's obligation to buy exponentially more than the set minimum provided in the Seller Clause, or to select

from the abundance grown or acquired by Plaintiff either the set minimum, or simply one cental of potato, or a single potato spud, or just a potato peel, Defendant's obligation would be limited to *that* quantity, which is incorporated into each of the three contracts by express reference to such "Schedule A."

Granted Defendant's obligation to purchase the amount of potatoes described in such "Schedule A," each contract appears to be contemplated by the parties either as an agreements for an exact quantity of goods or as a requirement contract, because neither K-I, K-II or K-III appear to be an output contract (since the language of each Buyer Clause does not obligate Defendant to buy either a fixed fraction of what Plaintiff can produce or the entirety of Plaintiff's production: rather, Defendant undertook the obligation to purchase a "Schedule A" amount of potatoes).  (Compl., Exs. A, B, C.)  Here, while the Buyer Clause obligated Defendant to purchase the amount of potatoes incorporated, by reference, from "a" Schedule A, the incorporation appears to be facially defective because *no* document titled "Schedule A" was presented to the Court.   See id.; cf. United Rubber, 269 F. Supp. at 715 (the terms of a contract could be incorporated through a reference to another writing, but these terms are interpreted as part of the contract *only to the extent of the reference*). This fact seems particularly striking in light of two other facts: (a) one being that, producing no schedules designated as "Schedule A" referenced to in K-I, K-II and K-III, the parties, nonetheless, took pains to produce the Specs-I and Specs-II and designate them with the title expressly referred to in the corresponding Specification Clause made part to each of the three contracts; (b) none of the schedules included in either Plaintiff's Set of Schedules or Defendant's Set of Schedules is signed, or dated, or otherwise marked with a statement indicating that these schedules should be deemed to

17

be the very "Schedules A" referenced to in K-I, K-II and K-III.[6]  Indeed, the documentary record before the Court equally allows for an argument that any schedule could be "the" Schedule A referred to in these contracts, or, that no such "Schedules A" exists.  Consequently, the documentary evidence before the Court leaves the possibility of having: (a) all three contracts at hand void, on the SOF grounds, on the basis of indefiniteness of the quantity of goods contracted for, see N.J. Stat. Ann. § 12A:2-201(1); or (b) either the Defendant's Set of Schedules or that of Plaintiff's admitted, through extrinsic evidence, as such "Schedules A," provided that the offered Sets of Schedules and the documents offered in support of qualifying a certain Set of Schedules as "the" Schedules A would pass muster under the parol evidence rule.  See N.J. Stat. Ann. § 12A:2-201.

It is also conceivable that, pursuant to the Admission Exception provided for in the SOF, Plaintiff might succeed at showing that statements made in Defendant's pleading or its testimony in this action removed the indefiniteness aspect, i.e., by showing that these statements qualify as Defendant's admission.  The parties' submissions made thus far suggest that Defendant might have admitted that the Defendant's Set of Schedules consisted of the very "Schedules A" corresponding to K-I, K-II and K-III.  (Docket Entry No. 22-2, Exs. B, C, D; see also Reply at 11.)  In contrast, Plaintiff's claim that a Defendant's officer admitted, during his testimony, that he was aware of the existence of the Additional Set of Schedules, cannot qualify as an admission that the Additional Set of Schedules is part of the "Schedules A" corresponding to K-I, K-II and K-III.  (Opp'n. at 31 (relying on the facts of: (a) Defendant's awareness of the existence of the Additional Set of

---

[6]

Moreover, while two schedules in Plaintiff's Set of Schedules contain notations indicating that they were amendments of prior schedules, these notations are strikingly void of any statements clarifying either the nature or the dates of these prior schedules, or to which contracts these prior schedules were correlated.

Schedules, and (b) Defendant's Bates stamping of its copy of the Additional Set of Schedules when preparing and selecting Plaintiff-related documentary evidence for this litigation but, apparently, failing to recognize that a litigant might prepare and Bates stamp any document for any reason, e.g., as a basis for an actual or potential defense, or as a part of pertinent record or even as an unrelated record of business dealings with the entity that has become a legal adversary); compare N.J. Stat. Ann. § 12A:2-201(3)(b) (discussing the party's *admissions* made in *pleadings, testimony or otherwise in court*, rather than that party's "awareness" about the existence and en masse Bates stamping of piles of documents)).   The Court, however, cannot rule out the possibility that Defendant's testimony other than that discussed in Plaintiff's Opposition might have included statements qualifying the Additional Set of Schedules as part of the "Schedules A."

Since  all three contracts are opened to the indefiniteness attack on the grounds of the parties' failure to state the essential material term of the quantity of goods contracted for, the Court, a fortiori, cannot summarily establish from that very record the amount of goods, which Defendant undertook the obligation to buy pursuant to these three contracts.  Therefore, Defendant's Motion will be denied as to the issue of the scope of this litigation, which the Court construed as the issue of the scope of Defendant's contractual duties, i.e., Defendant's liability.

### C.   The Proper Measure of Plaintiff's Damages

#### 1.   The Parties' Factual Allegations and Legal Positions

Defendant maintains that, in the event Plaintiff succeeds at establishing Defendant's liability for breach of its obligation to purchase a certain -- although currently unestablished -- quantity of potatoes, Plaintiff's damages should be limited to the sum of Plaintiff's lost profit ($236,250) and incidental damages in accordance with N.J. Stat. Ann. §§ 12A:1-106 and 12A:2-708.  (Mem. at 4-6,

Reply at 2-4.)   Plaintiff, however, asserts that, in the event Plaintiff succeeds at establishing Defendant's liability, Plaintiff's damages should be the sum of: (1) what Plaintiff designates as "lost business value"; (2) what Plaintiff perceives to be its "lost future profit"; and (3) either (a) the total contract price of K-I, K-II and K-III, or (b) Plaintiff's lost profit from these three contracts, together with what Plaintiff designates as "committed contract expenses."  (Opp'n. at 12-27.)   Plaintiff clarifies that

> after Defendant [notified Plaintiff of Defendant's termination of the three] contracts, [Plaintiff] met with [its potato] suppliers ("Suppliers Meeting") to discuss the situation . . . . Plaintiff and the [potato] suppliers agreed to [the following] plan [("Suppliers Compensation Accord")]: Plaintiff would sue [Defendant] for breach of contract and . . . the suppliers . . . would forebear [from] suing Plaintiff because . . . Plaintiff [would] settle their . . .claims from the proceeds [Plaintiff may obtain as a result of] this law suit.

Id. at 15.

Although Plaintiff conceded that the contracts for supply of potatoes entered in by the suppliers and Plaintiff with an eye on having Plaintiff resell the suppliers' potato to Defendant under K-I, K-II and K-III ("Supply Contracts") were "not written, and, perhaps, not in a form that would be acceptable to Defendant," id. at 27, Plaintiff maintains that it "is entitled to . . . be compensated for the amounts it has both already paid and [believes it] is obligated to pay, [at some unspecified point in the future, to the] potato . . . suppliers" under the Suppliers Compensation Accord.  Id. at 14.  Plaintiff collectively designates these amounts as "committed contract expenses."  (Opp'n. at 12-26.)

In addition, Plaintiff alleges that, since Plaintiff was making the bulk of its income from selling potatoes to Defendant, and that Defendant's termination of K-I, K-II and K-III, together with Defendant's refusal to continue doing business with Plaintiff, Defendant is liable for Plaintiff's

inability to make comparable income during the period of two (or so) years following the expiration of K-I, K-II and K-III ("Future Income claims").  See id. at 26-27.  Plaintiff qualifies its loss of the Future Income claims as those for "lost business value" and "lost future profits," without asserting the legal nature of these claims.  See id.

### 2.    Plaintiff's Future Income Claims

Plaintiff's claims, amounting to $1,184,000, so confused Defendant that Defendant dedicated the relevant pages of its Memorandum and Reply to discussion of cases dealing with lost profit due from *non-performance under the current contract* (rather than from potential loss of post-contract opportunities), or with *buyers'* consequential damages, or with the damages suffered by lost volume sellers, or those cases that did not even address the nature of a "loss of business reputation" claim, but rather dismissed the claim wholesale for lack of factual evidence. (Mem. at 10-11, Reply at 10.) Here, Plaintiff's claims seek to recover that profit, which Plaintiff could have made: (a) from Defendant, had Defendant continued contracting with Plaintiff after expiration of K-I, K-II and K-III; or (b) from third parties, in the event these third parties would contract with Plaintiff because of Plaintiff's status as a current, rather than past, middleman for Defendant.  (Opp'n. at 26-27.)

These Future Income claims are wholly baseless.  The record before the Court does not suggest that Plaintiff had vested contractual options to continue supplying potato to Defendant, or that Defendant committed a tortious interference with Plaintiff's prospective business advantage or injured Plaintiff's business reputation through defamation.  While it is indeed conceivable that Defendant's termination of K-I, K-II and K-III, coupled with Defendant's decision to stop doing business with Plaintiff, effectively put Plaintiff out of business, Defendant cannot be deemed liable for Plaintiff's unilateral business decision to put all its eggs in one basket.  For the foregoing reasons,

21

Defendant's Motion with respect to Plaintiff's Future Income claims will be granted and, in the event Plaintiff succeeds at establishing Defendant's liability for breach of its obligation to purchase a certain quantity of potatoes under K-I, or K-II or K-III, Plaintiff's damages will not include Plaintiff's alleged future income losses. These damages will be limited to Plaintiff's lost profit under K-I, K-II and K-III and Plaintiff's incidental damages, as explained below; the record before the Court suggests that this amount is in the range of a quarter million dollars, rather than four million.

### 3.    The Appropriate Damages Formula

The difference in the parties' positions as to the applicable damages formula appears to ensue from their reliance on different statutes. It appears that Plaintiff's reference to the three provisions not relied upon by Defendant, i.e., Sections 12A:2-703, 12A:2-704 and 12A:2-710, is provided in support of Plaintiff's claim that Defendant should be deemed liable for the monies which Plaintiff, allegedly, paid or might pay, on some unspecified date, to its supplier, pursuant to the Suppliers Compensation Accord. (Opp'n. at 13-26.) The price tag Plaintiff attaches to these particular potential liabilities is about $3 million (Mem. at 6-7), which Defendant qualifies, perhaps not entirely unreasonably, as a figure "intended [to cause an] in terrorem effect." Id. at 6; accord Bell Atl. Corp. v. Twombly, 127 S. Ct. at 1966 ("we explained that something beyond the mere possibility of loss causation must be alleged, lest a plaintiff with a largely groundless claim be allowed to take up the time of a number of other people, with the right to do so representing an in terrorem increment of the settlement value").

However, Sections 12A:2-703, 12A:2-704 and 12A:2-709 cannot lend support to Plaintiff's claim. Defendant is correct in that N.J. Stat. Ann. §§ 12A:2-703, 12A:2-704 and 12A:2-709 are either the generic provisions not establishing Plaintiff's entitlement to a specific measure of damages

22

or the statutes wholly inapposite to the case at bar, since they address the circumstances qualitatively different from the facts at here (Reply at 5-8), as well as in its conclusion that the amount of monies which Plaintiff, allegedly, might pay someday to some supplier present speculative damages not recognized by law.  (Mem. at 6-10).

If Plaintiff envisioned its potential liability to suppliers and wished to ensure that the suppliers would be able to collect their share damages from Defendant, Plaintiff should have either joined the suppliers as indispensable parties or impleaded them.  Correspondingly, the suppliers could have attempted to intervene.  However, Plaintiff and its suppliers elected to forgo their procedural rights and entered into the Suppliers Compensation Accord, contracting among themselves that Plaintiff should be allowed to collect, whatever Plaintiff may, from Defendant in this action and then divvy, someday, the pelf among the participants of the Accord.  (Opp'n. at 15.)

The reason for the suppliers and Plaintiff's decision not to pursue, in this or any other legal action, the claims based on the alleged Plaintiff's obligations to the suppliers appears to be obvious: the Supply Contracts (which, allegedly, obligated the suppliers to grow potatoes for Plaintiff's resale to Defendant) were "not written," (Opp'n. at 27), and, hence, wholly unenforceable under the New Jersey SOF, N.J. Stat. Ann. § 12A:2-201(1).[7]

While, indeed, no legal proposition prevented Plaintiff from promising to pay -- or from actually paying -- the suppliers, out of the goodness of Plaintiff's heart, millions of dollars at a certain

---

[7]

Since Plaintiff estimates the dollar value of its obligations to the suppliers (who were, allegedly, of two large-scale potato farmers) in the amount of $3 million or so, it appears safe to presume that the Supply Contracts were for the amount in excess of $500 and, thus, were subject to the "sufficient writing" requirement of Section 12A:2-201(1).

23

unspecified point in time,[8] Plaintiff has no legal right to obtain compensation for these payments from Defendant that never conceded to such payments, same as Plaintiff or its suppliers cannot transform their unenforceable Supply Contracts into enforceable documents by repackaging them into the Suppliers Compensation Accord: such an accord presents nothing but an ingenious agreement to evade the bar of the Statute of Frauds, and it cannot be enforced as a matter of public policy. See, e.g., Pedersen v. Akona, 429 F. Supp. 2d 1130, 1138 (D. Minn. 2006) ("The statute of frauds expresses the public policy of preventing enforcement of contracts by means of fraud and perjury that were never in fact made") (citation omitted); Sacred Heart Farmers Coop. Elevator v. Johnson, 305 Minn. 324, 327 (1975) (the buyer's intent to resale agricultural goods "cannot take contract out of statute of frauds because to do so would render statute of frauds meaningless, since [the middlemen] typically purchase [agricultural goods] solely for resale); Farmers Coop. Elevator Ass'n v. Cole, 239 N.W.2d 808, 814 (N.D. 1976) (exceptions to statute of frauds cannot be enlarged by trade usage, such as consistent failure of [agricultural goods] dealers to use written agreements when dealing with farmers). To paraphrase Plaintiff's own statement, to allow Plaintiff the damages

---

[8]

    Apparently, the scope of Plaintiff's obligation under the Suppliers Compensation Accord ranges from millions of dollars Plaintiff demands from Defendant to zero since, according to Plaintiff, it promised to pay its suppliers "from the proceeds [Plaintiff may obtain as a result of] this law suit." (Opp'n. at 15.) Since Plaintiff, obviously, could not guarantee to its suppliers that Plaintiff would necessarily win this action and recover millions of dollars in damages, and it was and remains just as plausible that Plaintiff might fail to prevail in this action (Ans. at 5 (asserting that "Defendant breached no duty, contractual or otherwise," and "Plaintiff's claims are barred by its failure to tender goods that conformed to those described in the contract[s,]" apparently implicating Defendant's rights under the Delivery Clause); see also Reply at 9 n.6 (apparently implicating Defendant's rights under the Inspection Clause by stating that Plaintiff refused to disclose the identities of its suppliers when Defendant, prior to termination of K-I, K-II and K-III, requested such information)), Plaintiff's alleged promise to pay its suppliers "from the proceeds [Plaintiff may obtain as a result of] this law suit" could be construed as an obligation to pay them nothing but a fraction of zero.

asserted on the basis of the Suppliers Compensation Accord would fly in the face of the bedrock principle of the UCC that a buyer cannot be held responsible for the seller's contractual claims not conforming to the written statement requirement.

For these reasons, Defendant's Motion will be granted as to the issue of the formula for calculation of Plaintiff's damages and, in the event Plaintiff succeeds in establishing Defendant's liability, Plaintiff's damages would be limited to: (a) Plaintiff's lost profit under those contracts among K-I, K-II and K-III which would be proved breached, pursuant to N.J. Stat. Ann. § 12A:2-708; plus (b) Plaintiff's incidental damages, as defined in 12A:2-710, which cannot be construed as entitling Plaintiff to compensation for the obligations Plaintiff allegedly undertook pursuant to the Suppliers Compensation Accord.

### 4.    The Amount of Damages

Defendant's argues that, in the event Plaintiff succeeds in establishing Defendant's liability, Plaintiff's lost profit figure should be the precise figure of $236,250.  (Mem. at 6.)  Defendant's Motion with respect to the Court's assessment of damaged is denied.  The Court leaves the actual amount of Plaintiff's lost profit to be established by factual evidence verifying Plaintiff's lost profit under K-I, K-II and K-III.

## IV.    CONCLUSION

For the foregoing reasons, Defendant's Motion will be granted in part and denied in part.

Specifically, Defendant's Motion will be denied as to the issue of the scope of this litigation, which the Court construed as the issue of the scope of Defendant's contractual duties, i.e., that inquiring about Defendant's potential maximum liability for its breach of obligation to purchase a certain amount of potatoes pursuant to K-I, K-II or K-III.

Defendant's Motion will also be denied as to Defendant's request for establishing the exact dollar amount of Plaintiff's potential lost profit.

Defendant's Motion will be granted with respect to Plaintiff's Future Income claims, as well as with respect to the request to determine the formula for calculation of Plaintiff's damages.  In the event Plaintiff succeeds at establishing Defendant's liability under K-I, K-II or K-III, Plaintiff will be allowed to collect damages equal to its lost profit under K-I, K-II and K-III, plus Plaintiff's incidental damages.  These incidental damages would not include Plaintiff's losses allegedly incurred as a result of the Suppliers Compensation Accord, or Plaintiff's lost aspirations to continue doing business with Defendant or with third parties.

An appropriate Order accompanies this Memorandum Opinion.


            s/ *John J. Hughes*
          **JOHN J. HUGHES**
       **United States Magistrate Judge**


**Dated**: July 28, 2008